IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| LIBORIO III, L.P., | § | |
| | § | No. 85, 2023 |
| Plaintiff Below, Appellant, | § | |
| | § | Court Below: Superior Court |
| v. | § | of the State of Delaware |
| | § | |
| ARTESIAN WATER COMPANY, | § | C.A. No. N22C-06-109 |
| INC., | § | |
| | § | |
| Defendant Below, Appellee. | § | |
| | § | |

Submitted: September 20, 2023
Decided: October 11, 2023

Before **SEITZ**, Chief Justice; **VALIHURA**, and **GRIFFITHS**, Justices.

## **O R D E R**

This 11th day of October 2023, after consideration of the parties' briefs, and the record below, it appears to the Court that:

(1)　　This is an appeal of Superior Court decision granting Defendant Below-Appellee's motion to dismiss. Plaintiff Below-Appellant filed suit in the Superior Court seeking relief in connection with several contracts governing the supply of water to a community in Bowers Beach, Delaware. Appellant, Liborio III, L.P. ("Liborio") brought claims for breach of contract and for fraud. The Superior Court dismissed both.

(2)　　This case also involves the Delaware Public Service Commission ("PSC") which regulates the activities of the Appellee, Artesian Water Company, Inc. ("Artesian"). In addition to the contracts entered into between Artesian and Liborio, an order

promulgated by the PSC factored in the trial court's analysis, with a particular focus on that order's effect on certain contracts.

(3)    The Superior Court examined the allegations in the complaint and those agreements fairly incorporated into the complaint.[1]  It found no breach.  Upon examining Liborio's fraud claim, the court held that the pleading lacked the requisite level of particularity.  We agree with the trial court that Liborio failed to satisfy the pleading requirements with respect to the fraud claim.

(4)    The breach of contract claim, though, presents a thornier question as there is an unresolved factual discrepancy in the record concerning the timing of the first agreement between the parties.  As to the contract claim, we remand the matter to the Superior Court to resolve this discrepancy and to determine whether its resolution of that issue affects the court's decision.

## I.    RELEVANT FACTUAL AND PROCEDURAL BACKGROUND[2]

### A. The Contracts Between the Parties

(5)    Liborio is a limited partnership organized under the laws of the State of

---

[1] The Superior Court stated that "[t]he only water services agreement included in the Complaint is the Phase II Water Service Agreement." *Liborio III, L.P. v. Artersan Water Co., Inc.*, 2023 WL 1981824, at *3 n.17 (Del. Super. Feb. 14, 2023) (hereinafter, "Opinion").  It further stated that it would "analysis [*sic*] only the Service Territory Agreement, the Phase II Water Services Agreement, and the Phase III Water Services Agreement." *Id*.  The trial court opinion's caption incorrectly spells "Artesian," as "Artersan," which is reflected in the Westlaw citation.

[2] The facts, except as otherwise noted, are taken from the Superior Court's Opinion. *See Liborio*, 2023 WL 1981824, at *1–4.

Because this is an appeal of a motion to dismiss, "[t]his Court will 'view the complaint in the light most favorable to the nonmoving party, accepting as true its well-pled allegations and drawing all reasonable inferences that logically flow from those allegations.'" *Windsor I, LLC v. CWCap.*

Delaware. It owns a land development in Bowers Beach, Delaware called Bowers Landing. Bowers Landing is a community consisting of 184 single-family lots. Bowers Landing receives its water from a single provider: Artesian. As the trial court described it, "the entirety of [Bowers Landing] is located within Artesian's water service monopoly."[3]

(6) To memorialize the supply of water to Bowers Landing, Liborio and Artesian entered into a service territory agreement (the "Service Territory Agreement") on July 30, 2002. Under the Service Territory Agreement, Artesian received exclusive rights to supply Bowers Landing's water supply. Further, the Service Territory Agreement provides that there would be future water service agreements between Artesian and Liborio, broken up into phases as Liborio develops specific lots being serviced. Several provisions of the Service Territory Agreement are relevant. One such provision provides for a refund to Liborio from Artesian (the "Refund Provision"). It states:

> Upon completion of each phase's installation, the final actual cost of the mains and hydrants will be computed and said cost, less the 15% overheads, shall be refundable to Owner at the rate of 15% of the net billings for water service and public fire protection for a period of twenty (20) years. Refunds shall be provided on a yearly basis.[4]

The Service Territory Agreement also provides for payment in phases (the "Payment Provision"):

> Owner agrees to pay Artesian the nonrefundable sum of Seventy-Five

---

*Asset Mgmt. LLC*, 238 A.3d 863, 871 (Del. 2020) (quoting *Deuley v. DynCorp Int'l, Inc.*, 8 A.3d 1156, 1160 (Del. 2010)).

[3] *Liborio*, 2023 WL 1981824, at *1.

[4] A16 (Service Territory Agreement ¶ 3).

3

Thousand Dollars ($75,000) for the Owner's share of the design and construction of the feeder main to the Development's entrance at Skeeter Neck Road and Dune Drive. The main contribution shall be payable as follows: Twenty-Five Thousand Dollars ($25,000) to be paid with the water service agreement for the first phase of water main construction, and Twenty-Five Thousand Dollars ($25,000) to be paid with the water service agreements for Phase 2 and Phase 3 respectively as these agreements are executed.[5]

(7)     Later, Liborio and Artesian executed the first water service agreement (the "Phase I Water Services Agreement") contemplated by the Service Territory Agreement. However, the timing of the Phase I Water Services Agreement's execution is the source of the discrepancy in the record that needs to be resolved. The Superior Court was under the impression that the Phase I Water Services Agreement was executed in 2004.[6] However, the Appellant states, in its opening and reply briefs, that the Phase I Water Services Agreement was executed in 2007: "[a]s alleged in the Complaint, on December 3, 2007, some twenty months after the enactment of PSC Order No. 6873, which eliminated refunds, the parties entered into the first phase-specific Agreement for Artesian to provide water service for Phase 1, 54 lots in Bower's Landing."[7] The Appellee does not refer to the date

---

[5] A15 (Service Territory Agreement ¶ 2).

[6] *Liborio*, 2023 WL 1981824, at *1 (stating that "[o]n July 30, 2002, Liborio and Artesian entered into a service territory agreement (the 'Service Territory Agreement') . . . [t]wo years after the Service Territory Agreement was executed the parties entered into their first water services agreement for the Phase I development of Bower's Landing.") *See also id.* at *9 (implying that the Phase I Water Services Agreement was executed before 2006 by stating that "[i]n April 2006, between the execution of the Phase I and Phase II Water Services Agreements, the PSC enacted Order No. 6873 . . . .")

[7] Opening Br. at 4. *See also* Reply Br. at 3 ("[c]onsequently, when the parties entered into an agreement in 2007 to provide water service for 54 lots in Phase 1, Artesian agreed that PSC Order No. 6873 was not applicable and Liborio would be entitled to 'refunds' for twenty years, as provided agreed [*sic*] in the 2002 agreement.").

4

of the Phase I Water Services Agreement, and neither party includes the Phase I Water Services Agreement in its appendix.

(8)  In 2006, the PSC promulgated a new order, Order No. 6873, governing water utilities. The goal of Order No. 6873 was to address "the terms and conditions under which regulated water utilities require Advances and/or Contributions In-Aid-Of Construction ('CIAC') from customers or developers[.]"[8] Order No. 6873 contains several relevant provisions. It first defines CIAC as:

> Cash, services, funds, property, or other value received from State, municipal, or other governmental agencies, individuals, contractors, or others for the purpose of constructing or aiding in the construction of utility plant and which represent a permanent infusion of capital from sources other than utility bondholders or stockholders.[9]

(9)  The order defines "Facilities Extension" as "the extension of the water utility's Mains and appurtenances ('Facilities') for the provision of water service."[10] It defines "New Services" as "the extension of pipe from the water utility's Mains to the customer's premises."[11] And there are several provisions detailing CIAC. One such provision provides:

> A utility shall require CIAC for Facilities Extensions to the extent provided in §§3.8.1 and 3.8.2 herein below. Nothing contained herein shall prevent a utility from requiring CIAC, or Advances, or neither, for the provision of New Services. Nothing herein shall prevent any utility from paying for, and

---

[8] A34 (PSC Order No. 6873 Recital).

[9] A35 (PSC Order No. 6873 § 1.3.12).

[10] A36 (PSC Order No. 6873 § 1.3.14).

[11] *Id.* (PSC Order No. 6873 § 1.3.15).

5

including in its rate base, the costs of New Services.[12]

Section 3.8.1 provides:

A utility shall require a CIAC when the request for a Facilities Extension will require the installation of pipe and/or associated utility plant. All charges henceforth to contractors, builders, developers, municipalities, homeowners, or other project sponsors, seeking the construction of water Facilities from a water utility company shall be in the form of a CIAC to be paid to the water utility as Category 1A, 1B and Category 2 costs, as computed under §§3.8.2 and 3.8.6, subject to true-up under §3.8.8.[13]

The order provides for computation of CIAC as follows:

Category 1A Costs.

All on-site Facilities costs that are directly assignable to a specific project are Category 1A costs and shall be designated by the utility and paid for by the contractor, builder, developer, municipality, homeowner, or other project sponsor, as CIAC, with no refunds. These costs include such items as Mains, hydrants, treatment plants, wells, pump stations, storage facilities, and shall include any other items that are necessary for the provision of utility water service. The cost of a Facilities Extension from the furthest point of the project site up to a point 100 feet beyond the boundary of the project (in the direction of the utility's existing Main) shall be considered a Category 1A Cost.

Category 1B Costs.

All off-site Facilities costs that are directly assignable to a specific project from such point 100 feet beyond the boundary of the project and continuing to the utility's existing Main are Category 1B Costs and shall be designated by the utility and funded by the contractor, builder, developer, municipality, homeowner, or other project sponsor, as a CIAC not subject to refund. These costs include such items as Mains, hydrants, treatment plants, wells, pump stations, storage facilities, and shall include any other items that are necessary for the provision of utility water service. Notwithstanding the foregoing, Category 1B Costs shall not include, and the utility shall be entitled to pay for and include in its rate base, any additional Facilities costs

---

[12] *Id.* (PSC Order No. 6873 § 3.8).

[13] *Id.* (PSC Order No. 6873 § 3.8.1).

elected to be incurred by the utility in connection with the Facilities Extension for company betterment. In determining whether Category 1B Costs are directly assignable to a project, or elected as company betterment, the CIAC shall be calculated based on the cost of installing Mains using a minimum of 8 inch diameter pipe, *provided, however,* that where Mains of a larger diameter are required by applicable laws, building or fire codes, or engineering standards to provide water service to the project on a stand-alone basis, the CIAC shall be calculated based on the cost of installing Mains using such larger diameter pipe.[14]

Order No. 6873 does not apply to every water utility. Rather, it contains a provision on its applicability (the "Applicability Provision"), which provides:

The regulations governing CIAC and Advances shall:

1.    apply only to Class A Water Utilities, and

2.    apply prospectively and therefore shall not affect or apply to circumstances where the water utility has already entered into a water service agreement with the contractor, builder, developer, municipality, homeowner, or other person, regarding the construction of water facilities.[15]

(10)    Liborio and Artesian did not execute another water service agreement until 2020 (the "Phase II Water Services Agreement"). This is the water service agreement in dispute between the parties. Paragraph 3 of the Phase II Water Services Agreement provides:

For all future phases of the Bowers Landing development Owner shall pay Artesian all contributions in aid of construction ("CIAC") then required by Sections 3.8 through 3.8.9 of the Public Service Commission's Minimum Service Standards Covering Service by Public Water Companies, PSC Order No. 6873, if any, and any and all costs related thereto, including, if then applicable, tax at the state and federal level as a consequence of the Tax Cuts

---

[14] *Id.* (PSC Order No. 6873 § 3.8.2) (emphasis in original).

[15] A37 (PSC Order No. 6873 § 3.8.9).

and Jobs Act of 2017.[16]

Paragraph 27 provides:

> This Agreement constitutes the entire agreement between the Parties with respect to the subject matter hereof, and supersedes all previous representations and understandings, oral or written, between the Parties. This Agreement may be amended, modified, waived, rescinded or otherwise changed only through a written instrument signed by both Parties. Any additional or different terms that either party subsequently delivers to the other party through drawings, specifications, invoices or other communications or documents are objected to and shall not be binding unless specifically accepted in writing by an authorized representative of the other party.[17]

(11)    The Phase II Water Services Agreement also contains a forum provision, providing that Artesian and Liborio "consent to the exclusive jurisdiction of the courts of the State of Delaware in all matters relating to the enforcement, interpretation or validity of this Agreement."[18]

### B. The Proceeding in Superior Court

(12)    Prior to executing the Phase II Water Services Agreement in May 2020, in April 2020, a representative from Liborio emailed Artesian with questions regarding Paragraph 3. Specifically, the Liborio representative had concerns that Paragraph 3 "is referencing and charging me a $1500 per lot CIAC fee but our agreement I believe predates that reg and our contribution in aid of construction is the main extension payment

---

[16] A19 (Phase II Water Services Agreement ¶ 3).

[17] A24 (Phase II Water Services Agreement ¶ 27).

[18] A23 (Phase II Water Services Agreement ¶ 21).

exclusively[.]"[19] Nevertheless, the parties executed the Phase II Water Services Agreement in the month following that email.

(13) More email exchanges between the parties occurred in 2022 — two years after execution of the contract. On February 2, 2022, the same Liborio representative who sent the April 2020 email emailed Artesian. This time, Liborio asked Artesian to "make it clearer please that [Artesian] intends to continue to pay the up to 15% annual rebate on the mains and hydrants cost called for in our original agreement please."[20] Artesian responded:

> We do not intend to pay the rebate. That rebate option was excluded on the same bases as the need to charge the connection fees. The PSC does not allow Artesian to repay developers for on-site like the 2002 agreement described. The new agreements expect the developer to pay for the installation of the on-site distribution system as a contribution.[21]

More email exchanges between the two sides came two weeks later, when Liborio responded to Artesian. Liborio stated that Artesian was "actually incorrect" and that it had looked at Order No. 6873 "and it specifically applies prospectively only and does not abrogate prior agreements (section 3.8.9)."[22] Artesian responded a few days later:

> While we agree that PSC Order No. 6873 applies prospectively, Liborio III, L.P. specifically agreed in paragraph 3 of the attached Phase 2 WSA that it shall pay Artesian all CIAC required by Sections 3.8 through 3.8.9 of PSC Order No. 6873 for all future phases of Bowers Landing. Section 3.8.2 specifically requires that the contractor, builder, or developer pay all on-site Facilities costs that are directly assignable to a specific project, including mains and hydrants, as CIAC and with no refunds.[23]

---

[19] A31 (Apr. 10, 2020, email).

[20] A32 (Feb. 2, 2022, email).

[21] *Id.*

[22] A33 (Feb. 16, 2022, email).

[23] *Id.* (Feb. 22, 2022, email).

9

Liborio's response was that Artesian's "conduct violates the good faith standard and the notion that I would trade our rights under the preexisting agreement for a ten thousand dollar or whatever it was benefit is laughable at best."[24] It concluded its response: "Please don't make me file suit."[25]

(14) Liborio filed its complaint in the Superior Court almost four months later in June 2022.[26] It alleged two causes of action: one count for breach of contract and one count for fraud. As the Superior Court described:

> In its first cause of action, Liborio contends that Artesian breached the Service Territory Agreement, along with the Phase II and Phase III Water Services Agreements by: (a) requiring Liborio pay the CIAC fees, and (b) failing to refund Liborio the costs of the mains and hydrants as required by the Service Territory Agreement. In its second cause of action, Liborio contends that Artesian intentionally provided Liborio with knowingly false information so as to induce it to enter into the latter water services agreements and to enrich Artesian.[27]

The trial court also noted a discrepancy in Liborio's pleading:

> It is not clear from the Complaint and the record which water services agreements Liborio alleges was breached. The only water services agreement included in the Complaint is the Phase II Water Services Agreement. But Liborio asserts that "Defendant is liable for any CIAC fees Plaintiff paid that were not owed for phases 3 and 4 and refundables for past and future phases as specified in the parties' 2002 Service Territory Agreement." Liborio never avers, nor is it clear from the Complaint, that the Phase IV Water Services Agreement was entered into. If the parties have not entered into the Phase IV Water Services Agreement, then there is no breach of contract. Accordingly, the Court will analysis [*sic*] only the Service

---

[24] *Id.* (Feb. 23, 2022, email).

[25] *Id.*

[26] *See* A7 (Compl.).

[27] *Liborio*, 2023 WL 1981824, at *3 (internal citations omitted).

Territory Agreement, the Phase II Water Services Agreement, and the Phase III Water Services Agreement.[28]

(15) Artesian moved to dismiss the complaint on three grounds: (1) that the trial court lacked jurisdiction to hear the case because the PSC had exclusive original jurisdiction; (2) that there was neither a breach of contract nor fraud because Order No. 6873 plainly applies to the Phase II and subsequent water services agreements; and (3) that Liborio failed to plead its fraud claim with particularity. Liborio countered that the trial court did have jurisdiction over the contract and fraud claims, that the Service Territory Agreement was still applicable, and that it had sufficiently pled the elements of a fraud claim.

(16) The trial court first found that it had jurisdiction to hear the dispute, a ruling that neither side challenges on appeal.[29]

(17) The court then addressed the fraud claim. It noted two concessions on Liborio's part:

> Liborio conceded that the entire fraud theory rested on its postulation that an Artesian representative had lied as to whether the "new regulations applied only prospectively." Moreover, *Liborio conceded that it did not read the PSC regulation*, but argues that Artesian was not only obligated to alert Liborio of the PSC change, and how it affected the water services agreements, but that by mentioning only the CIAC fee change and not the

---

[28] *Id.* at *3 n.17 (internal citation omitted).

[29] The court found that the breach of contract claim concerns "the applicability of the PSC regulation and its potential effect on payments a party to a contract might owe." *Id.* at *7. It also found that the fraud claim "concerns the alleged fraudulent inducement of Liborio into the Phase II and subsequent water services agreements." *Id.* Both of these, the court found, were matters within its traditional jurisdiction.

11

refund change, Artesian fraudulently induced Liborio into entering the water services agreements.[30]

With those concessions in mind, the trial court dispensed with Liborio's fraud claim, stating that the reason was "simple." As the trial court framed it:

> Liborio, a company more than adequately represented by counsel, failed to fully read its contracts and related documents, so it cannot possibly claim that reliance on an Artesian representative's verbal representations—or more aptly as Liborio pleads it, his failure to notify Liborio of the law—alone was reasonable.[31]

The court found that Liborio had not met the requisite level of pleading required for the elements of fraud. In summarizing its ruling, the court stated that "[p]ut simply, Liborio's failure to read and know the terms of its own written contracts and relevant regulations clearly and expressly referenced in those contracts doom its claim."[32]

(18) The court then addressed the breach of contract claim. It dismissed that claim as well. Liborio argued that the Service Territory Agreement controlled and that, because Order No. 6873 applies only prospectively, it had no effect on the Service Territory Agreement. The court did not agree. The court rejected the argument that the Service Territory Agreement is itself a water service agreement because:

> (a) Liborio itself doesn't call the agreement a water services agreement, rather it calls the agreement a "Service Territory Agreement"; (b) the more general Service Territory Agreement expressly anticipates the more specific subsequent agreements that are the "Water Service[s] Agreement[s]"; and (c) other agreements entered into by the parties are not only titled water services

---

[30] *Id.* (emphasis added) (internal citation omitted).

[31] *Id.* at *8.

[32] *Id.* (internal citation omitted).

agreements, but on their face include fundamentally different information, rights, and responsibilities from the Service Territory Agreement.[33]

(19)   The court then addressed the text of the contracts at issue, apparently assuming that the Phase I Water Services Agreement had been executed in 2004.  Although the Refund Provision did contemplate that Artesian would pay Liborio for the installation of mains and hydrants, Order No. 6873 changed that and barred such refunds.  The text of the Phase II Water Services Agreement explicitly stated that Order No. 6873 was in effect and that no refunds for mains and hydrants were permitted.  As the court put it, "both the Phase II Water Services Agreement and subsequent water services agreement were entered into after the promulgation of the PSC Order so the PSC Order applies to them and Artesian can demand CIAC fees."[34]  Accordingly, the court dismissed the breach of contract claim.

*C. Contentions on Appeal*

(20)   Liborio raises two claims of legal error on appeal.  *First*, Liborio contends that the trial court erred when it dismissed its breach of contract claim.  Liborio focuses its contract claim on the Service Territory Agreement, a contract that Liborio recognizes detailed "phases" and that "each phase would have different details" and "would have to be addressed by and in separate phase-specific agreements pursuant to the terms of the 2002 master Agreement for the 184 lots."[35]  Liborio makes the argument that the subsequent water service agreements "are not novations or new" but rather "are simply

---

[33] *Id.* at *9.

[34] *Id.* at *10.

[35] Opening Br. at 12.

13

addenda, specifying which lots in that phase will receive the already agreed to water service."[36] Under Liborio's view, this means that PSC Order No. 6873 "obviously does not apply."[37]

(21) *Second*, Liborio contends that it met the requirements to plead its fraud claim with particularity. Liborio contends that "Artesian's false and fraudulent representations are addressed and adequately alleged in the Complaint" and that Artesian "deceptively concealed that Artesian's intent was to not pay refunds."[38] In the alternative, should the Court determine more is needed to meet the pleading requirements, "Liborio would request that, in the interests of justice, the Court allow Liborio to amend the Complaint to redress any concerns or inadequacies."[39]

## II. STANDARD OF REVIEW

(22) "On appeal, we review 'the Superior Court's grant of a motion to dismiss' *de novo*."[40]

## III. ANALYSIS

A. *The Timing of the Phase I Water Services Agreement*

(23) We conclude that the Superior Court should resolve the discrepancy in the record concerning the timing of the Phase I Water Services Agreement. As noted above,

---

[36] *Id.* at 13.

[37] *Id.*

[38] *Id.* at 21.

[39] *Id.* at 22–23.

[40] *First Solar, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 274 A.3d 1006, 1011 (Del. 2022) (quoting *Difebo v. Bd. of Adjustment of New Castle Cnty.*, 132 A.3d 1154, 1156 (Del. 2016)).

the Superior Court was under the impression that the Phase I Water Services Agreement was executed in 2004, but the Appellant states that it was executed in 2007. This inconsistency could be relevant since the PSC promulgated Order No. 6873 in 2006. If the Phase I Water Services Agreement was executed in 2004, as stated by the Superior Court, then its decision would seemingly not be affected since the intervening promulgation of Order No. 6873 would explain the disparate treatment concerning refunds between the Phase I and Phase II agreements.[41] However, if the Phase I Water Services Agreement was executed in 2007, after the promulgation of Order No. 6873, the Appellant potentially has a course of dealing argument that could matter if the agreements at issue are found to be ambiguous.

(24) In its complaint, Liborio alleged that "Artesian has been making the refund payments for Phase 1 of the said project."[42] Liborio contends that:

> Artesian agreed and acknowledged that the 2006 new regulation eliminating refunds did not apply to the 2007 Phase I Agreement and paid and is still paying refunds for the Phase 1 lots. Logically therefore, the new regulation eliminating refunds also cannot apply to the subsequent Phase 2 and following phase agreements.[43]

Assuming the Phase I Water Services Agreement was in fact executed in 2007, the trial court might conclude that an inference could properly be drawn in Liborio's favor unless

---

[41] *Liborio*, 2023 WL 1981824, at *10 ("The initial Service Territory Agreement contemplated that Artesian would receive a refund for the installation of the mains and hydrants. But things changed. And the PSC Order and later Phase II Water Services Agreement barred that refund.") (Internal citation omitted).

[42] A8 (Compl. ¶7).

[43] Opening Br. at 13.

it is determined that the 2007 agreement does not matter and the other contracts are unambiguous. "At the motion to dismiss stage, '[p]laintiffs are entitled to all reasonable factual inferences that logically flow from the particularized facts alleged.'"[44]

(25) We note the weak rebuttal argument by Artesian. In response to Liborio's Phase I argument, Artesian merely states that:

> Second, Liborio argues that Phase 1 WSA is somehow relevant, although, as Judge Wallace correctly pointed out, "[t]hat agreement is not at issue here." . . . And as explained above, the WSAs contain integration clauses and the Phase 2 WSA specifically indicates that PSC Order No. 6873 must be adhered to.[45]

Thus, Artesian side-stepped the date issue entirely. Although, the Phase I Water Services Agreement is not the contract at issue here, that is not why Liborio raised it. Liborio raised the Phase I Water Services Agreement because it — like the Phase II Water Services Agreement — was purportedly entered into *following* Order No. 6873, when the prohibition on refunds began (again, assuming that it was executed in 2007). But unlike the Phase II Water Services Agreement, Artesian paid refunds under Phase I. Given this disparate treatment, Liborio suggests that it potentially has a course of dealing argument if

---

[44] *Gatz v. Ponsoldt*, 925 A.2d 1265, 1274–75 (Del. 2007) (quoting *White v. Panic*, 783 A.2d 543, 549 (Del. 2001)). "And while we must draw all reasonable inferences in the plaintiff's favor, we do not draw unreasonable inferences." *McElrath v. Kalanick*, 224 A.3d 982, 990 (Del. 2020) (internal citation omitted).

[45] Answering Br. at 13.

the Phase II Water Services Agreement is determined to be ambiguous, which determination would allow the Court to consider extrinsic evidence.[46]

(26)  Alternatively, if the Phase I Water Services Agreement was executed in 2004, as opposed to 2007, Liborio's breach of contract argument is likely insufficient.  On appeal, Liborio largely centers its argument around the Service Territory Agreement, calling it the "master" agreement and contending that it is the controlling contract.  In fact, Liborio states that "this claim involves the enforcement of the parties' 2002 Agreement for water service for Bower's Landing[.]"[47]  There does appear to be confusion as to which specific contract Liborio claims was breached, a fact noted by the trial court.[48]

(27)  Liborio argues that the subsequent water service agreements are not new contracts but rather "addenda" to the Service Territory Agreement.  Such an argument, we think, is meritless.  To start, the Service Territory Agreement itself contemplates that future agreements will be entered into between the two parties as Bowers Landing develops.[49]  It does not contemplate that such future agreements be addenda to the Service Territory Agreement.  And when one looks at the text of one of those future agreements — the Phase II Water Services Agreement — it becomes clear that the two sides entered into a separate

---

[46] *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1233 (Del. 1997) ("In construing an ambiguous contractual provision, a court may consider evidence of prior agreements and communications of the parties as well as trade usage or course of dealing.").

[47] Opening Br. at 11.

[48] *Liborio*, 2023 WL 1981824, at *3 n.17 ("It is not clear from the Complaint and the record which water services agreements Liborio alleges was breached.").

[49] *See* A15 (Service Territory Agreement ¶ 2) (noting the price for "the water service agreement for the first phase of water main construction" and the price for "the water service agreements for Phase 2 and Phase 3 respectively as these agreements are executed.").

17

contract.[50] The parties call it an "Agreement" and not an "Addendum." A recital represents that there was "good and valuable consideration" in its execution.[51] And, crucially, one provision provides that the contract "constitutes the *entire agreement between the Parties* with respect to the subject matter hereof, and supersedes all previous representations and understandings, oral or written, between the Parties."[52] Thus, the Phase II Water Services Agreement is a valid, enforceable contract itself, not an addendum to the Service Territory Agreement. If the Phase I Water Services Agreement was executed in 2004, the differential treatment of refunds in the Phase II Water Services Agreement would be explained by the intervening promulgation of Order No. 6873. Therefore, under this timeline, since the Phase II Water Services Agreement is its own valid and enforceable contract, rather than an "addenda," Liborio's breach of contract argument is not persuasive.

(28) We remand the case to the trial court to determine the date of the Phase I Water Services Agreement as we are unable to resolve this factual issue based on the record before us. The trial court should then determine whether its analysis is affected by the answer.

B. *Liborio Failed to Plead Fraud with Particularity*

(29) Liborio's second contention on appeal is that the trial court erred when it dismissed its fraud claim. Liborio centers its fraud claim around its contention that

---

[50] *See, e.g., Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1158 (Del. 2010) (setting forth the elements of a valid contract).

[51] *See* A18 (Phase II Water Services Agreement recital).

[52] A24 (Phase II Water Services Agreement ¶ 27) (emphasis added).

18

Artesian "intentionally misrepresented that the new regulations only dealt with contributions (CIAC)" and that Artesian "deceptively concealed that Artesian's intent was to not pay refunds."[53] Liborio's briefing on the fraud claim is fairly scant, and certain fraud-based arguments appear to be in its breach of contract section.

(30) For example, Liborio argues that the Phase II Water Services Agreement's "reference to PSC Order No. 6873 and Section 3.8 through 3.8.9 also does not put [Liborio] on notice that Artesian does not intend to pay refunds since Section 3.8.9 expressly provides that it does not apply to prior agreements."[54] Liborio also states that if the Phase II Water Services Agreement's reference to Order No. 6873 "was to notify Liborio or convey to Liborio Artesian's intent that it was not going to pay refunds, it should have candidly so stated. It is clear that Artesian intentionally sought to conceal that it was not going to pay refunds."[55]

> Artesian responds to Liborio's fraud argument as follows:
>
> Liborio fails to allege that Artesian made any misrepresentation. Liborio only alleges that on an unidentified date and time, in an unidentified place, an Artesian employee, Adam Gould, said that Liborio did not have to make any CIAC payment . . . . Liborio contends that Gould intentionally and "deceptively concealed" that "Artesian's intent was to not pay refunds" by not informing Liborio of the specific changes to the PSC's regulations.[56]

---

[53] Opening Br. at 21.

[54] *Id.* at 15.

[55] *Id.*

[56] Answering Br. at 16.

Artesian contends that "Liborio's failure to conduct its own due diligence and alter any terms of the Phase 2 WSA prior to its execution does not constitute fraud."[57]

(31)    We agree with Artesian.  The elements of a fraud are:

> To state a claim for fraud, a plaintiff must allege:  (1) a false representation made by the defendant; (2) the defendant knew or believed the representation was false or was recklessly indifferent to its truth; (3) the defendant intended to induce the plaintiff to act or refrain from acting; (4) the plaintiff acted or refrained from acting in justifiable reliance on the representation; and (5) damage resulted from such reliance.[58]

"The pleading standards for fraud claims are heightened."[59]  Superior Court Civil Rule 9(b) provides that "[i]n all averments of fraud . . ., the circumstances constituting fraud . . . shall be stated with particularity."[60]  In other words, "[t]he factual circumstances that must be stated with particularity refer to the time, place, and contents of the false representations; the facts misrepresented; the identity of the person(s) making the misrepresentation; and what that person(s) gained from making the misrepresentation."[61]

(32)    We agree with the trial court and Artesian that Liborio failed to plead fraud with particularity as required under Rule 9(b).  As the trial court found:

> Liborio conceded that it did not read the PSC regulation, but argues that Artesian was not only obligated to alert Liborio of the PSC change, and how it affected the water services agreements, but that by mentioning only the CIAC fee change and not the refund change, Artesian fraudulently induced Liborio into entering the water services agreements.  Important to the Court's

---

[57] *Id.* at 18.

[58] *Valley Joist BD Holdings, LLC v. EBSCO Indus., Inc.*, 269 A.3d 984, 988 (Del. 2021) (internal citation omitted).

[59] *Id.*

[60] Super. Ct. Civ. R. 9(b).

[61] *Id.*

decision here, the unread PSC regulation was expressly and clearly referenced in the Phase II Water Services Agreement.[62]

Liborio itself conceded that it did not read Order No. 6873. The Phase II Water Services Agreement expressly references the PSC order and the applicable sections — and those sections prohibit refunds. Further, an email from a Liborio representative sent on April 10, 2020 — more than a month before the Phase II Water Services Agreement was executed — requested that Artesian "double check the public service commissions reg's section 3.8 and 3.8.9 referenced in paragraph 3 of the draft agreement."[63] Thus, it is clear from the record that Liborio was aware of Order No. 6873, enough so that it sent additional questions regarding it, and, thus, could have looked into the regulation's applicability before signing the contract. It did not. Accordingly, we AFFIRM the Superior Court's dismissal of the fraud claim.

## IV. CONCLUSION

For the reasons set forth above, we AFFIRM in part and REVERSE in part the Superior Court's memorandum opinion and REMAND for proceedings on Liborio's breach of contract claim.

---

[62] *Liborio*, 2023 WL 1981824, at *7 (internal citation omitted).

[63] A31 (Apr. 10, 2020, email).